UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

DONALD GRAHAM,

                         Plaintiff,

            - against -                        **MEMORANDUM AND ORDER**

FIRST RELIANCE STANDARD LIFE
INSURANCE COMPANY and PENN                     04 Civ. 9797 (NRB)
MARITIME, INC. GROUP LONG TERM
DISABILITY INSURANCE PROGRAM
PLAN,

                         Defendants.

----------------------------------X
**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

        Donald Graham ("plaintiff" or "Graham"), a 67 year old man

with Parkinson's Disease, brings this action against First

Reliance Standard Affirmative Life Insurance Company ("First

Reliance") and Penn Maritime Group Long Term Disability

Insurance Plan (collectively, "defendants") to challenge the

denial of disability pension benefits under an employee benefit

plan governed by the Employment Retirement Income Security Act

("ERISA"), 29 U.S.C. § 1001 <u>et</u> <u>seq.</u> Graham contends that he was

"totally disabled" at the time he ended his employment with Penn

Maritime, Inc. ("Penn Maritime") on October 30, 1999, and thus

is entitled to Long Term Disability plan benefits.

        After defendants' earlier motion for summary judgment was

denied on August 10, 2006, <u>Graham v. First Reliance Standard</u>

1

Life Ins. Co., No. 04 Civ. 9797 (NRB), 2006 WL 2372244, at *1 (S.D.N.Y. Aug. 10, 2006), plaintiff moved to expand the administrative record.   Based on plaintiff's three previous opportunities to expand the record during his administrative review prior to this litigation, we found an absence of good cause and denied plaintiff's motion on November 22, 2006. Graham v. First Reliance Standard Life Ins. Co., No. 04 Civ. 9797 (NRB), 2006 WL 3408548 (S.D.N.Y. Nov. 22, 2006).   Plaintiff now moves for a judgment on the merits.[1]   For the reasons below, we find in favor of the defendants.

## DISCUSSION[2]

### I. Legal Framework

#### A. Standard of Review

A court's review of a decision to deny a claimant disability benefits is de novo "unless the benefit plan gives the administrator . . . discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). As First Reliance has not argued that it possessed any discretionary authority, our review of the record will be de novo.   See Kinstler v. First Reliance Standard Life Ins. Co.,

---

[1] Although plaintiff fails to specify the rule pursuant to which he moves, we shall treat his motion as one under Fed. R. Civ. P. 12(c).

[2] While we will refer to the administrative record throughout, a more detailed factual discussion can be found in our previous decision denying summary judgment.  Graham, 2006 WL 2372244, at *1-6.

181 F.3d 243, 249 (2d Cir. 1999) ("The plan administrator bears the burden of proving that the arbitrary and capricious standard of review applies, since the party claiming deferential review should prove the predicate that justifies it.") (internal quotation omitted).

**B. Burden of Proof**

Plaintiff bears the burden of proving that he is totally disabled within the meaning of the plan by a preponderance of the evidence. <u>Paese v. Hartford Life Accident Ins. Co.</u>, 449 F.3d 435, 441 (2d Cir. 2006). To qualify for Penn Maritime's Long Term Disability ("LTD") plan benefits, plaintiff's "[i]njury or [s]ickness" must render him unable to "perform the material duties of [his] regular occupation" during the Elimination Period (a period of 180 consecutive days, starting on the first day of disability claimed, during which no benefit is payable under the plan) and the first 60 months thereafter during which a monthly benefit is payable. AR 150-51. Even if a worker "is capable of only performing the material duties on a part-time basis or part of the material duties on a full-time basis," he is still considered totally disabled and hence qualified for LTD.[3] <u>Id.</u> Thus, in order to meet his burden, plaintiff must present evidence that he suffered symptoms from

---

[3] "[A]fter a Monthly Benefit has been paid for 60 months," in order to maintain LTD status, "an Insured cannot [be able to] perform the material duties of any occupation . . . that the Insured's education, training or experience will reasonably allow." <u>Id.</u>

his Parkinson's Disease which rendered him incapable of performing the material elements of his job since October 29, 1999, the day he ended his employment with Penn Maritime.

We will first review the physicians' opinions found in the record. We will then turn to evidence of specific functional limitations. Finally, we will discuss plaintiff's objections to First Reliance's reviews of his claim.

**C. Evaluating Treating Physicians' Opinions**

Although plan administrators cannot arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician, "courts have no warrant to require administrators automatically to accord special weight to the opinions of claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003). In fact, a court may "evaluate [a treating physician's] opinion in the context of any factors it considers relevant, such as the length and nature of their relationship, the level of the doctor's expertise, and the compatibility of the opinion with the other evidence." Connors v. Connecticut General Life Ins. Co., 272 F.3d 127, 135 (2d Cir. 2001). A physician's opinion is more credible when supported by medical and vocational evidence of contemporaneous functional

limitations.   Thus,  we  will  consider  the  treating  physicians'
opinions  by  taking  into  account  the  degree  to  which  they  are
supported by other evidence in the record.

## II.  Evidence in the Record

### A.  Requirements of Plaintiff's Job

Graham  served  as  a  Chartering  Representative  at  Penn
Maritime for 35 years until October 29, 1999, AR 348, scheduling
vessels  for  fueling  and  transport  of  supplies.   AR  130.   The
entry  for  plaintiff's  job  in  the  Dictionary  of  Occupational
Titles ("DOT")[4] lists  his  duties  as  including  "[d]etermin[ing]
the  number  and  kind  of  barges  and  lighters  needed  to  transport
cargo,"  "[c]oordinat[ing]  movement  of  vessels  to  ensure  most
efficient  service,"  "[a]ssign[ing]  barges  and  lighters  to
individual  haulage  jobs  and  issu[ing]  orders  to  [tugboat
captains],"  and  "[c]ompil[ing]  or  direct[ing]  activities  of
workers  engaged  in  compilation  of  periodic  reports  on  freight
tonnage  transported  and  cost  of  operations."   AR  132.   He
occasionally was required to lift up to 10 pounds and frequently
had  to  lift  "negligible"  amounts  of  weight.   AR  133.   According
to  the  DOT  Occupational  Requirements  of  Graham's  job,  while  the
general  learning  aptitude  and  verbal  aptitude  demanded  were

---

[4]  The  Dictionary  of  Occupational  Titles,  maintained  by  the
Department of Labor, categorizes each job in the United States and the
characteristics  of  those  jobs,  including  a  set  of  aptitudes  which
evaluate  the  skills  needed  to  perform  a  particular  job.   See,  e.g.,
Elcock v. Kmart Corp., 233 F.3d 734, 746-47 (3d Cir. 2000).

frequently relatively high (67-89 percent, or 2 out of 5 on the DOT scale), the levels of motor coordination and finger dexterity required were low (10-33 percent, or 4 out of 5 on the DOT scale), and the necessary levels of manual dexterity and eye-hand-foot coordination were very low (below 10 percent, or 5 out of 5 on the DOT scale). Id. According to Graham's office manager, Graham's job's physical requirements included continuous sitting and occasional walking, standing, stooping, kneeling, crouching, and reaching or working overhead. AR 130. His position was largely sedentary and did not require travel. Id. Tasks using his hands included "writing and computer work" and "phone coverage." Id. Plaintiff's job required continuous interaction with others, verbal and written communication, frequent use of "reasoning, math[,] and language," and making occasional independent judgments. Id.

**B. Summary of Medical Opinions**

Graham started developing symptoms of Parkinson's in 1996, about three years before declaring himself completely disabled. Defendants' Rule 56.1 Statement ("Def. 56.1 Stmt.") ¶ 7; Plaintiff's Response to Defendant's 56.1 Statement ("Pl. 56.1 Resp.") ¶ 7. Because of the progressive nature of the disease, Graham continued to work, and in 1997 began seeing a neurologist, Dr. Itzhak Haimovic, in addition to his internist, Dr. Marius Pessah. AR 91, 231. Graham continued to see

Doctors Pessah and Haimovic every several months, and the last time he saw a physician before his departure from his job at the end of October 1999 was on September 13, 1999.  See AR 231-33 (Dr. Haimovic's report of April 18, 2003, listing Graham's visits[5]); AR 329 (Letter from Dr. Haimovic to Dr. Pessah dated September 14, 1999).  However, around the time he left his job, Dr. Pessah referred him to Ms. Michelle Brett, a physical therapist, who evaluated Graham on November 20, 1999 in a one-page report.  AR 296.  After Graham moved to Nevada in February 2000, AR 331, he regularly consulted with a new neurologist, Dr. Steven Glyman.  AR 184-205.  Dr. Pessah's letter of June 4, 2003 states that Mr. Graham has been unable to work since November 1999, AR 212, and Dr. Haimovic's letter of April 18, 2003 states that Graham has been totally disabled from 1999 to the present.  AR 233.  Dr. Glyman's letter of March 30, 2004 notes that Graham is disabled at that time.  AR 205.

Plaintiff argues that he was unable to work due to several specific impairments, including his inability to concentrate and function generally, his inability to write and type, his inability to sit, his inability to drive, and his need to move to a warmer climate.  We shall address each of these in turn; however, we agree with the assessment of Dr. Craig Bogen, a

---

[5] Although Dr. Haimovic's April 18, 2003 reports the visit as having occurred on September 14, 1999, we rely upon Dr. Haimovic's letter to Dr. Pessah of September 14, 1999, which notes that his examination of Graham occurred the day before, on September 13, 1999.

doctor hired by First Reliance to evaluate Graham's administrative record, on March 7, 2003, and his determination that "most of the medical records available provided little or no help in establishing or understanding the impact of the patient's symptoms on his activities at the time he stopped working." AR 249. Diagnostic testing of functional limitations and specific comments on job performance are notably absent from the record,[6] and the only document in the record which "gives observational and qualitative historical detail" with regard to Graham's capacity to do his job at the time he left Penn Maritime is Ms. Brett's report of November 20, 1999. Id.

**C. Evidence of Functional Limitations**

**1. Ability to Concentrate and Function Generally**

In his original application, Graham claims the reason he was unable to perform his duties was his "difficulty concentrating on [the] job." AR 350. This is verified limitedly by Dr. Pessah's undated report, submitted by Graham along with his original claim on July 5, 2000, which states that symptoms included "limited moveability [sic] as well as

---

[6] Plaintiff includes with his briefs a letter dated March 28, 2003 from his former supervisor, Mr. William M. Waterman. This letter, however, was not included in Graham's submissions to First Reliance for any of the four reviews he received and the resultant three opportunities given by First Reliance for Graham to expand the administrative record, despite the presence of material dated after March 28, 2003. See, e.g., AR 191. In light of plaintiff's previous failure to justify an expansion of the administrative record, we shall not consider this evidence in our review. See generally Graham, 2006 WL 3408548.

[problems with] concentration and writing." AR 352. Although Dr. Pessah notes that his patient can never return to work, AR 353, the assessment of Graham's physical and mental capabilities does not actually establish that Graham's impairments prevented him from working. No diagnostic tests or job performance reviews were submitted into the record.

Plaintiff also submitted a form dated July 10, 2000 from Dr. Pessah claiming that the date of onset of Graham's impairment was November 1, 1999, and that Graham had a "severe impairment of complex, integrated [central nervous system] function" which prevented him from taking care of himself "in any situation or manner." AR 281. This assessment is contradicted by the report of Ms. Brett, Graham's physical therapist, on November 20, 1999, which stated that Graham "ambulates without an assistive device and is independent in all [activities of daily living]." AR 296. Further, the record contains no evidence to support a finding that he ever failed to perform his duties while working at Penn Maritime, much less had a complete inability "to care for [him]self in any situation or manner" as stated by Dr. Pessah. AR 281.

Without sufficient evidence contemporaneous to his termination of employment, the plaintiff instead relies on medical records submitted from a later time period. However, these records do not adequately demonstrate the severity of his

disability during earlier periods of time. Specifically, plaintiff, on January 22, 2003, acquired a letter from his former neurologist, Dr. Haimovic, which states that Graham, at the time of the letter, was "unable to perform any activity for any sustained period of time because of the severely advanced Parkinson's disease." AR 255. To argue that this later letter should suffice to establish plaintiff's status as disabled over three years earlier, plaintiff relies on Buffaloe v. Reliance Standard Life Ins. Co., No. 99 Civ. 710, 2000 WL 33951195, at *5-6 (E.D.N.C. Oct. 26, 2000), which held that later evidence of disability from a progressive disease can be used as evidence of prior disability. However, the value of Dr. Haimovic's letter is far less than the value of the evidence in Buffaloe. There, the court found that "an absolutely horrendous looking MRI scan", so severe that a physician commented "I can't see how a man with this kind of back is going to do any kind of productive work," provided evidentiary support of disability as of a scant two months before the scan, given that the damage reflected in the scan was caused by chronic back problems. Id. In contrast, here, there is no contemporaneous functional analysis, nor recorded diagnostic testing assessing Graham at the time he left Penn Maritime -- only a diagnosis occurring over three years after the claimed disability. The January 22, 2003 letter is particularly problematic since Dr. Haimovic's diagnosis at the

time of the alleged onset of total disability, set out in a letter dated September 14, 1999 to Dr. Pessah, made no mention of any cognitive problems whatsoever and actually disclaimed them, noting that plaintiff's "higher integrative functions" were "normal." AR 300. The January 22, 2003 letter was followed by an April 1, 2003 letter, in which Dr. Haimovic recites the meetings he had with Graham. AR 231-233. While at no point does he mention any problems with attention, even describing Graham's higher integrative functions as "alert, attentive, [and] oriented without receptive or expressive speech difficulties," he nevertheless reaches the conclusory result that Graham was totally disabled. Id.

In addition to these internal inconsistencies and inadequacies, Graham's evidence is repeatedly contradicted by other evidence of his cognitive capabilities. Through February 2003, Dr. Glyman continually noted that Graham was in good mental shape. See, e.g., AR 186 (noting "normal attention and memory" on November 21, 2001); AR 200 (noting that Graham "[d]enies confusion or memory issues" on February 5, 2003); AR 198 (noting "[n]o confusion or memory issues" on February 27, 2003). These specific descriptions of Graham's continued abilities four years after his departure from Penn Maritime are especially instructive, given that his condition is one that is recognized to be progressive. Given the gap between the

doctors' conclusions and their analysis, we do not find that plaintiff has met his burden to show his inability to concentrate in October of 1999.

### 2.  Ability to Write/Type

Graham claims his inability to write and type prevented him from working.  A letter of Dr. Haimovic stated that Graham first came to him on October 1, 1997, complaining of "difficulty with handwriting" as well as "micrographia."[7]   AR 221.   Although plaintiff does not make this specific argument, there may be a connection between plaintiff's documented tremor and his capacity to write.   See, e.g., AR 300 (Dr. Haimovic's noting a "[m]arked tremor" on September 14, 1999); AR 280 (Dr. Pessah's circling "tremor" under "[i]nvoluntary movement" on July 10, 2000); AR 233 (Dr. Haimovic's noting Graham's complaint of increasing tremors in 1999 and 2000 as compiled in his April 1, 2003 letter).   Dr. Pessah also pointed out Graham's "limited moveability [sic] as well as [problems with] concentration and writing" in his undated report submitted by Graham on July 5, 2000.  AR 352.  However, there is virtually no evidence that his Parkinson's affected his writing and typing to the extent that it completely incapacitated him from work by the end of October of 1999.   The only time his functional inability to work was

---

[7] Micrographia is a writing ailment "in which handwriting is tiny or decreases in size from normal to minute" and is "seen in parkinsonism."  Dorland's Illustrated Medical Dictionary 1111 (29th ed. 2000).

addressed by a doctor was in Dr. Haimovic's January 22, 2003 letter, which specified that Graham was "unable to write or use computers" by that time, but the problems with that letter have already been pointed out supra. See AR 255.

There are also a number of reasons to believe that, despite his tremor, Graham could write and type as required by his job. First, his tremor is never referred to as particularly severe. Second, in November 1999, Graham's physical therapist, Ms. Brett, noted "[c]oordination testing for finger to finger and finger to nose is normal." AR 296. Furthermore, Dr. Pessah's undated report submitted in July 2000 noted Graham's ability to perform limited repetitive fine manipulation. AR 353 (checking the "yes" boxes for ability to perform right and left "fine manipulation," although noting his capacity as "limited"). Finally, Dr. Glyman's reports throughout 2002 and 2003 do not indicate or reflect any significant tremor symptoms. See AR 204 ("[N]o significant tremor or rigidity noted" on February 14, 2002); AR 200 (noting "[f]ine tremor on the right with outstretched arms. No tremors at rest" on February 5, 2003); AR 198 (noting Graham's tremor was "barely noticeable with outstretched hands and none at rest" on February 27, 2003); AR 196 (noting "[n]o tremor" on March 18, 2003); AR 194 (noting "[n]o tremor noted at this time" on April 10, 2003); AR 192 (noting "[n]o tremor" on May 1, 2003). Again, since Parkinson's

is a progressive condition, it is particularly noteworthy that the tremor was either not present or barely noticeable as late as 2003.  Since his office manager described Graham's job as requiring only 10-33 percent motor coordination and finger dexterity (4 out of 5 on the DOT scale) and under 10 percent manual dexterity (5 out of 5 on the DOT scale), AR 133, it is reasonable to conclude that Graham should have been able to continue to write and type at least through October 1999.

Finally, the fact that Graham "was working until [October 29, 1999] without documentation of any restriction, modifications, or decline in work performance," as Dr. Bogen said in his assessment of Graham's administrative record, AR 249, makes it extremely unlikely that he was unable to work the day he left his job.  While Graham's office manager indicated that the job could not be modified to accommodate disability, AR 131, the report did not state that Graham had become so disabled as to be unable to perform the material duties of the job. Likewise, the last assessment before the date of disability (Dr. Haimovic's September 14, 1999 letter) did not opine that Graham was unable to work.  AR 329 (Dr. Haimovic's noted only a "marked tremor," without referencing ability to work in the September 14, 1999 letter).  Id.  Accordingly, we conclude that Graham has not proven that on October 30, 1999, he was unable to write and

14

type to a degree that he could not perform the material duties of his job.

### 3. Ability to Sit

Plaintiff further claims that his inability to sit prevented him from performing the sedentary duties of his occupation. There is mixed evidence concerning his ability to sit. In support of Graham's claim, Dr. Pessah, in his undated report submitted with Graham's original claim on July 5, 2000, stated that Graham is only able to sit, stand, or walk 1-3 hours each per 8 hour day. AR 353. Additionally, Dr. Haimovic's January 22, 2003 letter notes that Graham's "Parkinson's reduces his ability to sit, stand, or walk for more than five minutes at a time[,] and he must move about at all times." AR 255. At the outset, we note that these letters were written respectively eight months and over three years after the alleged onset of total disability. Moreover, the record contains evidence from Dr. Glyman covering time periods subsequent to plaintiff's cessation of work. In February 2003, Dr. Glyman noted "[p]ostural stability," plaintiff's ability to arise from his chair without using arms, and no problems with any of the activities of daily living. AR 198. Furthermore, in three separate visits, Dr. Glyman observed on February 5, 2003 that plaintiff was "[i]ncreas[ing] his exercise" and "golfing," AR 200, on February 27, 2003 that he planned to play golf again

that day, AR 198, and on March 17, 2003 that he played 36 holes of golf the day before, AR 196, all after his condition should have worsened.

Finally, even accepting that there were limitations on plaintiff's ability to sit, stand, and walk, there is no basis to conclude that he could not perform the duties of his job. Plaintiff's job could be performed alternating between standing and sitting.  AR 130 (Office Manager, assessing Graham's job, checking "yes" next to "Can the job be performed by alternating sitting and standing?").  Accordingly, we conclude that Graham's impaired capacity to sit did not preclude him from performing the material duties of his job

### 4.  Ability to Drive

In a September 21, 2000 letter to an examiner for First Reliance, Graham claims his various symptoms prevented him from commuting 84 miles round-trip, to and from work.  AR 271.  Dr. Haimovic, in his January 22, 2003 letter, notes that Graham is "unable to drive because of the severity of his tremor."  AR 255.  Commuting, though, is not a material duty of employment, and "a claimant's commute to a particular job site is not a consideration for determining disability."  Nelson v. Unum Life Ins. Co. of America, 421 F.Supp.2d 558, 568 (E.D.N.Y. 2006). Further, plaintiff's claimed inability to drive is particularly unpersuasive.  Even Dr. Pessah's undated report, submitted by

Graham on July 5, 2000, which concluded that Graham is disabled, still notes Graham's ability to drive 1-3 hours a day following the date he resigned his job.  AR 353.

### 5.  Need to Change Climate

Plaintiff claims that he moved to Las Vegas, Nevada in February 2000 in light of Dr. Pessah's advice to move to a warmer climate to lessen the advancement of his condition.  AR 271.  There are no medical records to verify that Dr. Pessah made such a statement.  Furthermore, plaintiff himself contradicted this statement earlier, when he claimed the reason for the move was his wife's arthritis.  AR 331.  Thus, there is no support for the need to change climate other than the plaintiff's unilateral and self-contradicted claim.

## III.  Plaintiff's Objections to First Reliance's Reviews of His Claim

### A.  The Reviews Were "Full and Fair"

Plaintiff argues at length that First Reliance's reviews were not "full and fair" and that its decisions were "arbitrary and capricious."  Since this review is de novo, the question of procedural fairness is not relevant to whether plaintiff substantively deserved coverage.[8]  Furthermore, "[a]t its core, the full and fair review requirement 'include[s] knowing what evidence the decision-maker relied upon, having an opportunity

---

[8] We are unclear as to whether plaintiff intends to limit this argument to apply only in the context of his breach of fiduciary duty claim, a claim which he abandoned in his latest brief.

to address the accuracy and reliability of that evidence, and
having the decision-maker consider the evidence presented by
both parties prior to reaching and rendering his decision.'"
Anderson v. Sotheby's, Inc., No. 04 Civ. 8180 (SAS), 2006 WL
1722576, at *18 (S.D.N.Y. June 22, 2006) (quoting Grossmuller v.
International Union, United Auto. Aerospace & Agric. Implement
Workers of Am., U.A.W. Local 813, 715 F.2d 853, 858 n.5 (3d Cir.
1983) (citing Morgan v. United States, 304 U.S. 1, 18-19
(1938))).   Here, plaintiff received four reviews, each with an
explanation.   Under these circumstances, any suggestion that
Graham was not given an opportunity to understand what First
Reliance relied on, address the evidence, and then have it
considered during the administrative process rings hollow.   In
fact, many of plaintiff's complaints, such as that decisions
were "incorrect" or "fail[ed] to reach the logical conclusion,"
Plaintiff's Memorandum of Law in Support ("Pl. Mem.") at 11, 15,
are substantive objections and do not demonstrate that First
Reliance's procedures were unfair.   Not only were the reviews of
Graham's claim both full and fair, but, as we previously noted,
Graham was given "more opportunities for review than he was
entitled to receive." Graham, 2006 WL 2272244, at *7 n.16.

**B.   Short Term Disability Qualification as Evidence for LTD Qualification**

Plaintiff also advances the argument that because he
received Short Term Disability ("STD") benefits he is entitled

to receive LTD benefits.  The parties agree that an individual is qualified for STD if he/she is "unable to do the material duties of [his/her] job; not doing any work for payment; and under the regular care of a physician."  See Complaint ¶ 19; Answer ¶ 19.  While the standards for STD and LTD are similar, we do not conclude that First Reliance's willingness to pay STD benefits precludes it from reassessing that position when an application for LTD is made.  We credit First Reliance's description of how the process for STD coverage relies on a different record, how the benefits are "paid for a limited time and with no waiting period,"[9] and how "decisions on eligibility are often made based on the doctor's information contained in the application."  Defendants' Memorandum of Law in Support ("Def. Mem.") at 11.  The existence of differences in the STD and LTD determination procedures provides further support for the conclusion that the two decisions are separate and that First Reliance is not bound by its STD decision when it conducts a LTD review.  Any decision to the contrary would only encourage First Reliance to be niggardly in its award of STD benefits lest it be faced with this argument repeatedly.

### C.   Social Security Disability Qualification as Evidence for LTD Qualification

---

[9]  As described supra, the waiting period for LTD benefits is known as the "Elimination Period," which lasts for 180 consecutive days after the date of termination.  AR 150-51.

The plaintiff also asserts that his receipt of Social Security Disability ("SSD") benefits must be given considerable weight in First Reliance's determination of his LTD eligibility. The law is clear that qualification for SSD is not binding on insurance companies' disability determinations. Paese v. Hartford Life Accident Ins. Co., 449 F.3d 435, 442 (2d Cir. 2006) (holding that courts and companies are not bound by SSD decisions, though they are also not bound to ignore them). Moreover, in this case there are specific reasons why the decision of the Social Security Administration ("SSA") is not dispositive. First, there is a disability listing for Parkinson's Disease which can be met by someone with limitations insufficient to meet the LTD requirement of the plan at issue. Specifically, for SSD purposes, a person has a listed impairment when he has Parkinson's with "[s]ignificant rigidity, bradykinesia, or tremor in two extremities, which, singly or in combination, result in sustained disturbance of gross and dexterous movements, or gait and station." 20 C.F.R. Pt. 404, Subpt. P. App. 1, 11.06 (2006). An individual may still be able to perform the material requirements of her job and thus not be totally disabled under the plan, even if she exhibits the symptoms for Parkinson's Disease in the SSD listing. Second, it is not clear that the SSA had the same information before it as did First Reliance. Since we are not privy to the record upon

which the SSA based its decision when it made its determination on November 4, 2000, AR 264-68, and plaintiff has not claimed that he submitted the same information to the SSA as he did to First Reliance, we cannot conclude that the records were identical, and therefore cannot draw any firm conclusion about the basis for the different results reached.   Finally, "SSA regulations require that an ALJ give controlling weight to the treating physician's opinion," when well-supported and not contradicted by other substantial evidence.   Matos ex rel. Mota v. Barnhart, No. 05 Civ. 10539 (NRB), 2007 WL 943654, at *7 (S.D.N.Y. Mar. 27, 2007) (citing 20 C.F.R. § 416.927(d)(2), and Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000)).   Insurance companies, however, are not required to show such deference. Black & Decker Disability Plan, 538 U.S. at 834.   Thus, the fact that First Reliance did not give substantial weight to the SSA decision does not amount to procedural unfairness.

Plaintiff also argues that First Reliance's requirement that an individual seeking LTD coverage apply for SSD obligates First Reliance at least to consider the SSA's decision a significant factor.   We do not agree.   The LTD plan is structured to require beneficiaries to apply for SSD because the monthly benefit received from the LTD plan is offset by other income benefits, including SSD.   AR 156.   Accordingly, the requirement that plaintiff apply for SSD is imposed to insure

that the plan not bear the full cost of the monthly payments to a beneficiary if he qualifies for other sources of income.  This rationale is not the equivalent of a delegation of LTD decision-making to the SSA.

### E.   Reliance on Objective Medical Evidence

Plaintiff argues that First Reliance unreasonably ignored the subjective opinions of doctors and instead unfairly demanded objective medical evidence of disability.  Plaintiff points to Sanderson v. Continental Casualty Corp., which held that ignoring the opinions of treating physicians is arbitrary and capricious.  279 F.Supp.2d 466, 477 (D. Del. 2003).  Plaintiff then cites a letter by Robert Rose, the First Reliance Claims Examiner in charge of deciding plaintiff's initial claim.  In his letter, Rose rejects plaintiff's original application for LTD, stating that First Reliance's "determination regarding whether [Graham meets] the policy's definition of disability is, and must be, based on the objective medical documentation in [his] claim file."  AR 53.  Rose further stated that First Reliance had "no basis to measure subjective complaints or medical opinions that are not substantiated by objective medical findings."  AR 53.  However, First Reliance's decision to credit objective evidence over subjective evidence was not unreasonable or illegitimate.  See, e.g., Couture v. UNUM Provident Corp., 315 F.Supp.2d 418, 432 (S.D.N.Y. 2004) ("It is not unreasonable

for an insurer to credit objective evidence over subjective evidence.").

Plaintiff also argues that the requirement of "objective medical evidence" is impermissible on the grounds that First Reliance is "[f]undamentally [a]lter[ing] the [s]ubstantive [t]erms of the LTD [p]lan." Pl. Mem. at 27. Requiring such evidence has been deemed permissible. See, e.g., Couture, 315 F.Supp.2d at 431 (upholding a rejection of coverage due to a lack of objective medical evidence). In any event, in light of Mr. Rose's decision letter, plaintiff knew First Reliance's position from the outset, and he had three opportunities to provide the desired evidence. Job performance reviews, for example, as well as physicians' detailed statements that supported plaintiff's disability claim, should have been easily obtainable by plaintiff if the claim of disability could be supported. Thus, his failure to produce such evidence cannot be excused.

**F.  Reliance on Physical Therapist**

Plaintiff also argues that First Reliance's consideration of the report of Ms. Brett, plaintiff's physical therapist, was unfair. Dr. Pessah referred Graham to Ms. Brett to help him build up muscle in his legs, AR 120, and Ms. Brett's summary of her session, sent to Dr. Pessah on November 20, 1999, was used by First Reliance as evidence of Graham's capabilities. See,

e.g., AR 239.  Ms. Brett clearly knew that Graham was suffering from Parkinson's.  AR 296.  It was consistent with her work as a physical therapist to assess plaintiff's physical limitations. Plaintiff advances no persuasive argument to sustain a conclusion that her evaluation was unreliable.  Accordingly, we do not find that the consideration of the physical therapist's report inherently negates the fullness or fairness of First Reliance's review.

### G.  Requirement of Independent Medical Examination

Plaintiff lastly claims that First Reliance was obligated to conduct an independent medical examination.  It was not.  It had the right but not the obligation to do so under the insurance contract, AR 153, and courts have declined to read such clauses as imposing a requirement upon an insurer to conduct such examinations.  See, e.g., Couture, 315 F.Supp.2d at 432 (holding a denial of benefits without an independent medical evaluation not to be arbitrary and capricious).  Thus, the lack of such a medical examination does not imply that the review was per se incomplete or unfair.

## CONCLUSION

For the reasons set forth above, and having examined the record de novo, we have not found within the record evidence sufficient to fulfill plaintiff's burden to establish his inability to perform the material duties of his job as of October 30, 1999, the date of the termination of his employment. Thus, we agree with defendant First Reliance's previous determinations that plaintiff was not totally disabled when he left Penn Maritime, as is required to qualify for Long Term Disability Benefits under the plan.  Accordingly, we find in favor of the defendants, First Reliance and Penn Maritime Group Long Term Disability Insurance Plan and dismiss plaintiff's complaint.

**IT IS SO ORDERED.**

Dated:    New York, New York
          July 31, 2007

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

25

Copies of the foregoing Memorandum and Order have been mailed on this date to the following:

Counsel for Plaintiff

Patrick H. Busse, Esq.
Binder & Binder, P.C.
2805 Veterans Memorial Highway, Suite 20
Ronkonkoma, NY 11779

Counsel for Defendants

Joshua Bachrach, Esq.
Rawle & Henderson LLP
The Widener Building
One South Penn Square
Philadelphia, PA 19107